

# Fourth Court of Appeals
## San Antonio, Texas

## OPINION

No. 04-16-00774-CR

Delfino **LOPEZ** Jr.,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 406th Judicial District Court, Webb County, Texas
Trial Court No. 2015CRN001126 D4
Honorable Oscar J. Hale Jr., Judge Presiding

Opinion by:    Patricia O. Alvarez, Justice

Sitting:    Karen Angelini, Justice
Rebeca C. Martinez, Justice
Patricia O. Alvarez, Justice

Delivered and Filed: June 27, 2018

AFFIRMED

A Webb County jury found Appellant Delfino Lopez Jr. guilty of the felony murder of eleven-month-old Delfino Lopez III, and assessed punishment at sixty-years confinement in the Institutional Division of the Texas Department of Criminal Justice. On appeal, Lopez contends the trial court erred in (1) denying his motions to suppress statements made to officers of the Laredo Police Department and an investigator with Child Protective Services, and (2) failing to include limiting instructions, regarding the voluntariness of Lopez's statements, in the jury charge. Lopez also asserts the trial court erred in (1) refusing to allow him to argue for an acquittal during

closing arguments, (2) admitting autopsy photographs, and (3) overruling defense counsel's objection to the State's improper jury argument. We affirm the trial court's judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

On July 30, 2015, Laredo Emergency Responders were dispatched to the home of Delfino Lopez Jr. and Noemi Rodriguez, for an unresponsive "11-month old patient possibly having a seizure." The baby was transported to Laredo Medical Center Emergency Room. Dr. Jaime Pinero, Delfino III's[1] treating physician, testified the child showed signs of multiple bruises at different stages of healing, the child was posturing (suggesting severe brain trauma causing involuntary movement), and the baby was very small for his biological age. Dr. Pinero diagnosed Delfino with a traumatic brain injury, subdural hematoma, and transtentorial herniation, all of which appeared to be caused by a "repeated physical abuse in a short span of time." Delfino was transported to University Hospital in San Antonio where he died several days later, on August 3, 2015.

Based on the severity of the baby's injuries, the hospital case manager, Betty Salinas, contacted Child Protective Services, a program within the Department of Family and Protective Services. While treatment was still ongoing for Delfino, Dr. Pinero also reported his findings to Laredo Police Department Officer Gerardo Quiroz. Detective Charlie Rosales was dispatched to the Lopez residence and Detective Robert Ramirez to the emergency room. After confirming the doctor's diagnosis and opinion that the parents' version of events was inconsistent with the injuries suffered by the child, the detectives requested Lopez and Rodriguez, who was nine-months pregnant, accompany them to Laredo Police Department for further interviewing.

---

[1] For purposes of this opinion, Delfino Lopez Jr. will be referred to as "Lopez" and Delfino Lopez III will be referred to as "Delfino."

Rodriguez was transported in Detective Ramirez's unmarked vehicle and Lopez was transported in Officer Quiroz's marked patrol vehicle. Both detectives testified that neither Lopez nor Rodriguez were in custody, both voluntarily accompanied the officers to the police department, and both voluntarily provided statements to the officers. Out of precaution, and based on standard protocol, both individuals were *Mirandized* prior to the start of the video-recorded interviews. Lopez, however, contends the officers did not fully comply with article 38.22 of the Texas Code of Criminal Procedure, the Texas statutory equivalent of *Miranda*. *See Oursbourn v. State*, 259 S.W.3d 159, 169 (Tex. Crim. App. 2008). Specifically, Lopez argues the officer failed to warn him that he had the right to terminate the interview. *See* TEX. CODE CRIM. PROC. ANN. art. 38.22, sec. 2(a)(5) (West 2018) ("[the accused] has the right to terminate the interview at any time").

After Lopez provided his statement to Detective Rosales, an arrest warrant was obtained and he was placed under arrest for injury to a child with serious bodily injury. While Lopez was being processed by the police department, CPS Special Investigator Jose Gonzalez arrived at the police department. Detective Primo Guzman informed Investigator Gonzalez that the officers were finished questioning Lopez and agreed to allow Investigator Gonzalez an opportunity to talk to Lopez prior to his being transported to Webb County Jail. Lopez then provided a statement to Investigator Gonzalez, echoing much of what he had previously relayed to Detective Rosales. The charges against Lopez were upgraded to felony-murder when Delfino subsequently passed away several days later.

We turn first to Lopez's assertion the trial court erred in overruling his pretrial motions to suppress the statements given to CPS Special Investigator Gonzalez and Laredo Police Department Detective Rosales.

**MOTIONS TO SUPPRESS**

**A.      Standard of Review**

An appellate court reviews a trial court's ruling on a motion to suppress using a bifurcated standard of review; we "afford almost total deference to a trial court's determination of the historical facts that the record supports." *Montanez v. State*, 195 S.W.3d 101, 106 (Tex. Crim. App. 2006) (quoting *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)); *accord Turrubiate v. State*, 399 S.W.3d 147, 150 (Tex. Crim. App. 2013).  A reviewing court must

> give almost total deference to the trial court's rulings on (1) questions of historical fact, even if the trial court's determination of those facts was not based on an evaluation of credibility and demeanor, and (2) application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor. But when application-of-law-to-fact questions do not turn on the credibility and demeanor of the witnesses, we review the trial court's rulings on those questions de novo.

*Wilson v. State*, 442 S.W.3d 779, 783 (Tex. App.—Fort Worth 2014, pet. ref'd) (citations omitted); *see also Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010); *Swearingen v. State*, 143 S.W.3d 808, 811 (Tex. Crim. App. 2004).

**B.      Interview Conducted by CPS Investigator**

*1.      When* Miranda *Warnings are Required*

"In *Miranda v. Arizona*, the Supreme Court held that the State may not use any statements stemming from 'custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.'" *Wilkerson v. State*, 173 S.W.3d 521, 526 (Tex. Crim. App. 2005) (footnote omitted) (quoting *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)).  Texas requires compliance with Texas Code of Criminal Procedure article 38.22 for the State to use any statement stemming from an interrogation.  *See* TEX. CODE CRIM. PROC. ANN. art. 38.22; *Nonn v. State*, 117 S.W.3d 874, 880 (Tex. Crim. App. 2003); *State v. Aguilar*, 535 S.W.3d 600, 605 (Tex. App.—San Antonio 2017, no pet.).  A custodial

interrogation is any "questioning initiated by *law enforcement officers* after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Wilkerson*, 173 S.W.3d at 526 (quoting *Miranda*, 384 U.S. at 444). *Miranda*'s purpose is to protect against physical or psychological pressure being used against an individual, that is in custody, and subjected to questioning by law enforcement officers or "those who are working for or on behalf of . . . law-enforcement [officers]." *Id*. at 527–28. The question this court must decide is whether the CPS investigator was "working for or on behalf of" the Laredo Police Department. *See id*. at 528; *Aguilar*, 535 S.W.3d at 605 ("Although CPS workers are state agents, their state employment alone does not render them law enforcement agents for [the] purpose of 'defining a custodial interrogation.'") (quoting *Berry v. State*, 233 S.W.3d 847, 855 (Tex. Crim. App. 2007)).

In *Wilkerson*, the Court of Criminal Appeals set out the different jobs and responsibilities for a law enforcement officer versus a CPS caseworker. "It is law enforcement's job to ferret out crime, investigate its commission, arrest the perpetrator, and gather evidence for a possible prosecution." 173 S.W.3d at 528; *accord Aguilar*, 535 S.W.3d at 605. The goal of CPS workers "is to protect the welfare and safety of children in the community," which necessarily includes examining family placement and safety matters to the extent of investigating child abuse claims or reporting statutorily required suspected child abuse to law enforcement authorities. *Wilkerson*, 173 S.W.3d at 528; *accord Aguilar*, 535 S.W.3d at 605. As this court previously explained,

> [T]heir paths converge when there is an allegation that "a child has been or may be the victim of conduct that constitutes a criminal offense that poses an immediate risk of physical or sexual abuse of a child that could result in the death of or serious harm to the child[.]"

*Aguilar*, 535 S.W.3d at 605 (citing TEX. FAM. CODE ANN. § 261.301(f) (West Supp. 2018)) (second alteration in original).

Although CPS investigators are state-agency employees, when they investigate family placement and safety matters, *Miranda* and article 38.22 warnings are not required. *Wilkerson*, 173 S.W.3d at 528 (citing TEX. CODE CRIM. PROC. ANN. art. 38.22); *Aguilar*, 535 S.W.3d at 605. However, if the police and the CPS investigator are investigating the criminal offense together, or "in tandem," the CPS investigator is an agent of the police and *Miranda* and article 38.22 warnings may be necessary. *Wilkerson*, 173 S.W.3d at 528; *accord Aguilar*, 535 S.W.3d at 605.

The *Wilkerson* Court set forth three areas of inquiry to determine whether the CPS investigator was working "in cahoots" with or as a "conduit" for the law enforcement officer. *Wilkerson*, 173 S.W.3d at 531; *Aguilar*, 535 S.W.3d at 606.

First, the relationship between law enforcement and the CPS worker: Was law enforcement using the investigator to accomplish what they could not lawfully accomplish? *See Wilkerson*, 173 S.W.3d at 530; *Aguilar*, 535 S.W.3d at 606. The court should consider, inter alia, whether the police knew about, arranged for, or were present during the interview; whether police provided the interviewer with the questions to ask, gave implicit or explicit instructions to obtain certain information; and whether this was a calculated attempt to evoke an incriminating response from the defendant during the interview. *See Wilkerson*, 173 S.W.3d at 530; *Aguilar*, 535 S.W.3d at 606.

Second, the CPS investigator's actions and perceptions: Did the CPS worker "believe he was acting as an agent of law enforcement?" *Wilkerson*, 173 S.W.3d at 530; *Aguilar*, 535 S.W.3d at 606. The court should consider, inter alia, whether the interviewer's primary reason for questioning the person was for gaining information and evidence for a criminal prosecution or related to some other goal; how did the interviewer become involved in the case; whether the interviewer provided information to law enforcement that led to the defendant's arrest; whether the interviewer was pursuing another goal or performing another duty; and who requested that the

interviewer question the defendant?  *See Wilkerson*, 173 S.W.3d at 530; *Aguilar*, 535 S.W.3d at 606.

And, third, the defendant's perceptions of the encounter: Whether a reasonable person would believe the investigator was an agent of law enforcement.  *See Wilkerson*, 173 S.W.3d at 530; *Aguilar*, 535 S.W.3d at 606.  Here, the court should consider, inter alia, did the "defendant believe that he was speaking with a law-enforcement agent, [or] someone cloaked with the actual or apparent authority of the police?"  *Wilkerson*, 173 S.W.3d at 530; *Aguilar*, 535 S.W.3d at 606. And if the answer was yes, why?  *Wilkerson*, 173 S.W.3d at 530.

2. *Special Investigator Gonzalez's Relationship to Laredo Police Department*

Special Investigator Gonzalez testified during the motion to suppress hearing.  Investigator Gonzalez had been with CPS for over six years after retiring from the Laredo Police Department. He was contacted on July 30, 2015, by the statewide CPS office in Austin, Texas, regarding the child death case of Delfino Lopez III.[2]  He was notified the parents were at the Laredo Police Department.  When he arrived, Investigator Gonzalez spoke briefly with Sergeant Guzman, who "filled [him] in on the details, . . . [b]asically what was going on.  They had a case, a dead child, a suspect, and his wife, that they were interviewing them."  The officers suspected Lopez was the individual that caused the injuries to Delfino.  Sergeant Guzman agreed to Investigator Gonzalez's request to speak to Lopez, who was in the process of being processed—"pictures, fingerprints, stuff like that"—before being transported to the jail.  Although Investigator Gonzalez never asked, he acknowledged on cross-examination that he could reasonably assume by Lopez's location and the action being taken by the officers, that Lopez had been placed under arrest.  Investigator Gonzalez, however, asserted that he was not concerned about Lopez's classification at the police

---

[2] We note the discrepancy in the testimony.  Delfino was unconscious and in critical condition on July 30, 2015, the day in question.  However, Delfino passed away four days later, on August 3, 2015.

department; his agency was working a case that was changing almost hour by hour. Once Lopez moved to the jail, the process to see him would be very complicated. "[Investigator Gonzalez had his] agency want[ing] to know what happened, what's happening in the case, almost hour, by hour. So [he had] to get to the major witnesses as soon as [he could] and as soon as [he had] an opportunity." While Investigator Gonzalez spoke to Lopez, his associate, CPS Special Investigator Sylvia Rojas, spoke to Rodriguez.

Investigator Gonzalez testified that he introduced himself to Lopez; he explained that he was from Child Protective Services. Investigator Gonzalez was not wearing a badge or gun. Investigator Gonzalez further explained that although Lopez's freedom of movement may have been restricted by the Laredo Police Department, nothing on the part of CPS, their investigation, or the statement being taken, affected Lopez's ability to leave the room, talk to the investigator, or not talk to the investigator. It is undisputed that Investigator Gonzalez did not provide *Miranda* warnings or comply with article 38.22 of the Texas Code of Criminal Procedure.

Investigator Gonzalez acknowledged pursuant to section 261.301(f) of the Texas Family Code, his paperwork and his agency considered the case a "joint investigation" with the Laredo Police Department. *See* TEX. FAM. CODE ANN. § 261.301(f). Yet, Investigator Gonzalez explained that the term "joint investigation" is simply a computer-generated term:

> State law requires that when there's an injury or a sexual abuse of a child, that there be two investigations made; one by law enforcement for criminal purposes and one by CPS for the protection of the child. And if we [CPS] get the report first, then we have to notify law enforcement. Then if they get the report first, they have to notify CPS. And that's what they call a joint investigation. . . .

Investigator Gonzalez testified that, during his interview with Lopez, he was alone with Lopez, no one from the Laredo Police Department or any other law enforcement agency requested that he ask Lopez any questions, and he did not help the police department in their investigation.

Investigator Gonzalez was conducting the interview of Lopez, on behalf of CPS, "in order to determine the state of the of the child or any remaining siblings."

The questions asked of Lopez were part of a global assessment—designed to solicit information about the family environment and family life. Their conversation was not recorded, and Investigator Gonzalez testified that he wrote his report and submitted the report to his agency. He did not submit the report to the Laredo Police Department and did not receive any requests that he do so.

3. *Analysis under* Wilkerson

As required, we analyze Investigator Gonzalez and Lopez's interview and the investigator's relationship with the Laredo Police Department under all three areas of inquiry identified in *Wilkerson*. *See Wilkerson*, 173 S.W.3d at 530.

First, although Investigator Gonzalez worked for the Laredo Police Department for twenty-nine years, his testimony—that his investigations with CPS were separate and distinct from those conducted by the police department—was uncontroverted. *See id.* (looking at entanglement of relationship between officers and CPS investigators). Investigator Gonzalez's presence at the police department was not at the behest of law enforcement, but at the request of CPS. *See id.*; *cf. Aguilar*, 535 S.W.3d at 608 (explaining the police department called CPS, the CPS investigator met the officers at the crime scene before interviewing the defendant, and officer told investigator defendant confessed). Additionally, although the officers allowed Investigator Gonzalez to use an interview room at the police department, they did not arrange for the interview, they were not present during the interview, and they did not provide Investigator Gonzalez with questions to ask or information to be obtained. *See Wilkerson*, 173 S.W.3d at 530; *see also Hailey v. State*, 413 S.W.3d 457, 483 (Tex. App.—Fort Worth 2012, pet. ref'd) (considering strength of law

enforcement's case before CPS interview and lack of evidence police used CPS interview "to accomplish what they could not lawfully accomplish themselves").

Second, Investigator Gonzalez testified, unequivocally, that he conducted a child death investigation, on behalf of CPS and at the request of CPS; his sole purpose was to determine the safety and welfare of the remaining child in the home. Although law enforcement officers' questioning of Lopez, as part of a police investigation, was to determine whether a crime was committed, Investigator Gonzalez's purpose in inquiring whether Delfino had been a victim of abuse or neglect was to determine the safety and welfare of Delfino's two-year-old sister. *See Wilkerson*, 173 S.W.3d at 530; *cf. Aguilar*, 535 S.W.3d at 609 (concluding investigator had sufficient information to determine existence of child abuse or neglect before interviewing defendant because he had already met with medical examiner who provided cause of death, met with officers at least twice, and knew defendant had confessed to offense). Affording deference to the trial court's rulings, *Wilson v. State*, 442 S.W.3d 779, 783 (Tex. App.—Fort Worth 2014, pet. ref'd), the record supports that Investigator Gonzalez was not acting on behalf of the Laredo Police Department; did not discuss his interview with, or provide copies of his report to law enforcement officers; or assist law enforcement officers in preparing their criminal case for prosecution. *See Wilkerson*, 173 S.W.3d at 530; *Hailey*, 413 S.W.3d at 484 (noting record does not reflect CPS investigator assisted police in building criminal case against defendant).

Third, although there is no direct testimony regarding Lopez's perception of whether he believed Investigator Gonzalez was an agent of law enforcement, we examine the record to determine whether a reasonable person would believe the investigator was an agent of law enforcement. *See Wilkerson*, 173 S.W.3d at 530. Investigator Gonzalez was not wearing a badge, gun, or law enforcement uniform. He identified himself as a CPS investigator and explained why he was questioning Lopez. There were no other law enforcement officers in the room, Lopez had

only been at the police department for a short period of time, and the interview took place in a different location than the law enforcement interview. *Cf. Aguilar*, 535 S.W.3d at 610.

Lopez bore the burden to prove his statement to Investigator Gonzalez was a product of a custodial interrogation by an agent of law enforcement. *See Wilkerson*, 173 S.W.3d at 532. Viewing the evidence in the light most favorable to the trial court's ruling, and deferring to the trial court's explicit and implicit findings of fact, *see Montanez*, 195 S.W.3d at 106, we conclude the trial court did not abuse its discretion in finding (1) that Investigator Gonzalez did not act as an "agent of law enforcement" when he conducted the interview of Lopez, or (2) that such interview was not "for the primary purpose of gathering evidence or statement to be used in a later criminal proceeding against" Lopez, *see Wilkerson*, 173 S.W.3d at 530; *Ripstra v. State*, 514 S.W.3d 305, 316 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd); *Hailey*, 413 S.W.3d at 484. Accordingly, we conclude the trial court did not err in denying the motion to suppress Lopez's statement given to CPS Investigator Gonzalez.

Having concluded the statement was properly admitted before the jury, we consider the content of that testimony.

*4.       Lopez's Statement to Special Investigator Gonzalez*

Investigator Gonzalez testified that Lopez told him several things about how the baby sustained the injuries.

> He told me that he had been depressed for some time and that he left his job because he didn't feel he was being paid enough. And then he told me that the birthday party for his two children, [V.L.] and Delfino, [was] coming up in August and he didn't have any money.

Lopez continued that his sisters owned their own homes, but he did not. His father was older and his mother was very sickly. The night before Delfino was injured, Lopez and Rodriguez went to

bed around 11:00 p.m. Rodriguez woke up at approximately 3:00 a.m. and 5:00 a.m. to care for Delfino. The last time he remembered Rodriguez getting out of bed was 11:00 a.m.

> [Lopez] said that he couldn't tell [Gonzalez] how many hours had passed, but a couple of hours passed, and then the baby started crying. So [Lopez] changed the baby's diaper—baby Delfino's diaper—and the baby still wouldn't stop crying.
>
> . . . .
>
> So he said that he shook the baby and he motioned like this. (Demonstrating) He demonstrated, and then he said the baby stopped crying. But then he said the baby started crying again. So he said that he then threw the baby on the bed.

Investigator Gonzalez questioned Lopez's version, explaining that Delfino had bruises on his head, face, and neck. Lopez explained,

> No, I didn't hit him. When I threw him on the bed, he hit the wall first. He hit the wall first and then I grabbed him from the bed and I shook him again.

Investigator Gonzalez continued that Lopez told him that he started shaking Delfino again and that was when the baby's eyes "started rolling back into his head." Lopez then "took him to the air-conditioner and put him under the air-conditioner. And since he couldn't get him to come back, he called his wife." Lopez handed Delfino to Rodriguez and he called 911. At that point Investigator Gonzalez stopped the interview.

We next turn to Lopez's statement given to detectives at the Laredo Police Department.

## C.     Interview Conducted by Laredo Police Officers

Turning to the merits of Lopez's issues related to the interview and statements associated with the detectives from the Laredo Police Department, we focus only on whether Lopez was harmed by the admission of evidence. For the sake of argument, we will assume, without deciding, that Lopez was in custody at the time of his questioning, and that the trial court erred by admitting Detective Rosales's testimony in violation of *Miranda*. Because the alleged error is constitutional

in magnitude, we conduct our assessment of harm using the standard set forth in Rule 44.2(a) of the Rules of Appellate Procedure. *See* TEX. R. APP. P. 44.2(a).

1.      *Texas Rule of Appellate Procedure 44.2*

Rule 44.2(a) provides that an appellate court "must reverse a judgment of conviction or punishment unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment." *Id*. A constitutional error does not contribute to the conviction if the verdict "would have been the same absent the error." *See Clay v. State*, 240 S.W.3d 895, 904 (Tex. Crim. App. 2007). We must "calculate, as nearly as possible, the probable impact of the error on the jury in light of the other evidence." *McCarthy v. State*, 65 S.W.3d 47, 55 (Tex. Crim. App. 2001); *Wall v. State*, 184 S.W.3d 730, 746 (Tex. Crim. App. 2006). While our review must focus on the error and its effect, "the presence of other overwhelming evidence that was properly admitted which supports the material fact to which the inadmissible evidence was directed may be an important factor in the evaluation of harm." *Wall*, 184 S.W.3d at 746 (citing *Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000)); *see also Snowden v. State*, 353 S.W.3d 815, 822 (Tex. Crim. App. 2011). Because the error in this case relates to the admission of evidence, we specifically consider whether the record contains other properly admitted evidence that supports the material fact to which the inadmissible evidence was directed. *See Wall*, 184 S.W.3d at 746. The trial court's error is harmless if there is no reasonable likelihood that the error materially affected the jury's deliberations. *See Neal v. State*, 256 S.W.3d 264, 284 (Tex. Crim. App. 2008).

2.      *Lopez Statement Provided to Investigators with the Laredo Police Department*

The two officers in the room at the time of Lopez's statement to police were Laredo Police officers Detective Richard Ramirez and Detective Charlie Rosales. The State offered a copy of the video recording and the transcript of Lopez's interview through Detective Ramirez. They were

both published before the jury. Detective Ramirez testified that, at first, Lopez claimed Delfino's injuries were the result of an accident, "the baby was dropped, and that he was unconscious. . . . [T]he baby was unconscious and was unresponsive; he didn't cry."

Detective Rosales, the primary interviewing officer, testified that his first encounter with Lopez was at the hospital. "Lopez stated that he had changed his child's diaper and that he had been sweating so he placed the child next to the A/C unit. While doing so, the child apparently went into a seizure state." During the interview at the police department, Detective Rosales confronted Lopez with the emergency room physician report that the baby's "brain had shifted substantially," and that the parents' version of events did not match the injuries suffered by the child. Rosales questioned Lopez about the child's facial injuries.

> The doctor had stated that there was some type of force; force had to be used for the child to suffer that type of—what do you call it?—a brain shift. And then Mr. Lopez provided several different details as to, you know, from the child falling on several occasions, to the child crying, and losing patience with the child because he was trying to help his spouse since she was cooking in the kitchen. All those small details, you know, and swinging the child from one arm with one leg, tossing him onto the bed.

Lopez told the officer that he played "rough" with Delfino, and described a "habit" of throwing the baby in the air and catching him; but that morning, Lopez was unable to "catch him," the baby fell to the floor, and was knocked unconscious. When Detective Rosales was asked how the shaking factored into his probable cause determination to arrest Lopez, he explained as follows:

> [Lopez] actually demonstrated that he had grown impatient because the child was crying. So he shook him violently, and so violently that the head actually tilted backwards and that was the last—that shake caused the child to go into a convulsion state.

*3.    Analysis*

In determining whether the alleged error was harmless, we consider the importance of Lopez's statement to Detective Rosales in light of the State's entire case, whether Lopez's

statement was cumulative of other evidence, whether other evidence corroborates Lopez's statement, and the overall strength of the prosecution's case. *See Davis v. State*, 203 S.W.3d 845, 852 (Tex. Crim. App. 2006). "If there is a reasonable likelihood that the error materially affected the jury's deliberations, then the error is not harmless beyond a reasonable doubt." *Wall*, 184 S.W.3d at 746.

The statement Lopez provided to CPS Investigator Gonzalez was a very similar version of the events he described to Detectives Rosales and Ramirez. In other words, Lopez's statement to the law enforcement officers was cumulative of his statement to the investigator; the statements also corroborated each other, as well as other statements, including the testimony of the doctors regarding the nature of the injuries sustained by the child and the evidence collected by the officers at the house and the hospital, to support the overall strength of the State's case. *See Davis*, 203 S.W.3d at 852. Having already determined the trial court did not err in admitting Investigator Gonzalez's testimony, Lopez's statement to Investigator Gonzalez was properly before the jury. Therefore, even if we assume the trial court erred in allowing Detective Rosales's testimony, the video, and the translation, we cannot conclude there was a "reasonable likelihood that the error materially affected the jury's deliberations." *See Wall*, 184 S.W.3d at 746. Based on a review of the entire record, we cannot conclude that any alleged error contributed to Lopez's conviction. *See* TEX. R. APP. P. 44.2(a); *Davis*, 203 S.W.3d at 849–50; *Wall*, 184 S.W.3d at 746. Accordingly, the trial court did not err in denying the motion to suppress Lopez's statement to the Laredo Police Department officers.

We turn to Lopez's contention the trial court erred in failing to include instructions pursuant to articles 38.22, section 7 and 38.23 in the jury charge. *See* TEX. CODE CRIM. PROC. ANN. arts. 38.22; 38.23 (West 2018).

## D.    Limiting Instruction

On appeal, defense counsel argues the trial court erred in failing to include voluntariness instructions in the jury charge as follows: (1) an article 38.22, section 7 as to Lopez's statement given to the Laredo police officers, and (1) an article 38.23 as to Lopez's statement given to Investigator Gonzalez.

### 1.    Almanza *and Required Harm*

In resolving a challenge to the jury charge, we first determine whether error exists. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005).  If we find error, we analyze that error for harm under the applicable standard set out in *Almanza v. State*, 686 S.W.2d 157 (Tex. Crim. App. 1984) (op. on reh'g).  *See Barrios v. State*, 283 S.W.3d 348, 350 (Tex. Crim. App. 2009).

### 2.    *Texas Code of Criminal Procedure Article 38.23*

Defense counsel requested a voluntariness instruction charge under Texas Code of Criminal Procedure article 38.23.  *See* TEX. CODE CRIM. PROC. ANN. art. 38.23.  "A defendant is entitled to this instruction if: (1) the evidence heard by the jury raises an issue of fact, (2) the defendant affirmatively contests the evidence on that fact, and (3) the contested factual issue is material to the lawfulness of the challenged conduct." *Oursbourn*, 259 S.W.3d at 177 (citing TEX. CODE CRIM. PROC. ANN. art. 38.22, § 7); *see also Hovis v. State*, 513 S.W.3d 649, 651 (Tex. App.—Houston [14th Dist.] 2016, no pet.); *De La Fuente v. State*, 432 S.W.3d 415, 426 (Tex. App—San Antonio 2014, pet. ref'd).

The State objected to Lopez's proposed charge regarding voluntariness under article 38.23 because (1) Lopez's proposed jury charge improperly commented on the weight of the evidence instead of simply providing an issue and application and (2) Lopez failed to raise an issue of fact, material to the lawfulness of the challenged conduct.  Relying on *Oursbourne*, 259 S.W.3d at 177, the State argued that Lopez was required to:

create a reasonable doubt as to a factual matter essential to the voluntariness of a statement. And the factual dispute can be raised only by affirmative evidence, not by cross-examination of State's witnesses or argument.

We don't believe the defense has crossed that threshold here. At most, all they've done is cross-examine police officers, but the questions by attorneys are not evidence themselves, and the police officers were all very firm in saying that the defendant was neither in custody, nor did he speak to them involuntary, or was the subject of coercion.

The trial court inquired from defense counsel how his argument changed from his prior argument that Lopez's statement given to Investigator Gonzalez was a question of custody and that issue was that the "statement given to CPS was that it was fruit of the poisonous tree." Defense counsel explained, that in addition to being fruit of the poisonous tree,

[T]he whole basis of [CPS Investigator Gonzalez] testifying here shows that he was in fact gathering evidence for criminal prosecution. A jury could reasonably find that there is a scintilla of relevant factual dispute that they were acting in tandem.

. . . .

[T]here is the test that *Wilkerson* applies regarding the three prongs, which are, one, what is the relationship between the agency; two, what is the intent of the CPS officer; and the third prong, which is what a reasonable person would believe in this situation.

We believe, you know, in this situation, given all the historical facts, there are issues of facts that would lend to each of those three factors, which is, again, why we're requesting that this instruction be included in the jury charge.

Even assuming, without deciding, that Lopez offered affirmative evidence raising a fact issue as to whether CPS Investigator Gonzalez was working in tandem with the Laredo Police Department, Lopez was still required to show evidence of harm. *See Almanza*, 686 S.W.3d at 171. Because error was preserved in the trial court, appellant must only show "some harm" from the trial court's refusing his request for an article 38.23 instruction. *Mills v. State*, 296 S.W.3d 843, 849 (Tex. App.—Austin 2009, pet. ref'd) (citing *Almanza*, 686 S.W.3d at 171). The appellate court must examine the record as a whole to find if it can "say with confidence that the error did

not cause some harm." *Ovalle v. State*, 13 S.W.3d 774, 787–88 (Tex. Crim. App. 2000) (the defendant does not have the burden of proof; "actual harm" is not required).

We consider all of the evidence and testimony without the benefit of Lopez's statement to Investigator Gonzalez. Prior to the officers arriving at the hospital, and prior to either Detective Rosales or Investigator Gonzalez speaking to Lopez, Lopez spoke to hospital personnel regarding the injuries sustained by Delfino. By his own admission, he was the only person with Delfino when the baby began seizing and lost consciousness. The emergency room doctor testified that Lopez's version of events did not comport with the injuries sustained by Delfino. The University Hospital doctor and the medical examiner also provided further testimony regarding the force necessary to cause the resulting injury to Delfino's spinal cord. All three doctors testified Delfino's injuries were inconsistent with a child overheating and having a seizure. The State also presented evidence of bruising on Delfino's body consistent with "serial shaking" and "repeated physical abuse." Even the defense expert opined Delfino's death was caused by a significant "shaking injury," more likely magnified by his chronic malnourishment.

Viewing all of the evidence in Lopez's favor, and not considering the statements Lopez gave to both Laredo police officers and Investigator Gonzalez, we conclude there was still sufficient evidence upon which the jury could have found each of the necessary elements of the charged offense. Accordingly, the record does not support that the trial court's failure to provide the requested article 38.23 voluntariness instruction, Lopez suffered "some harm," as required by *Almanza*. *See id.*

### 3. Texas Code of Criminal Procedure Article 38.22, Section 7

During the charge conference, defense counsel also requested the following charge on the question of voluntariness:

> we're . . . requesting just the language on voluntariness generally under 38.22, I believe (6), which is just that even if a person—with case law—even if a person isn't in custody under 38.22(6), there's still the issue of voluntariness. Here, we think that there are facts that were presented or that show that it may not have been voluntary.

*See* TEX. CODE CRIM. PROC. ANN. art. 38.22, sec. 6 ("Upon the finding by the judge as a matter of law and fact that the statement was voluntarily made, evidence pertaining to such matter may be submitted to the jury and it shall be instructed that unless the jury believes beyond a reasonable doubt that the statement was voluntarily made, the jury shall not consider such statement for any purpose nor any evidence obtained as a result thereof."). Lopez received the requested instruction.

On appeal, Lopez contends the trial court erred in failing to provide an instruction that Lopez's statement to Detective Rosales was involuntary because Lopez was not warned as required by article 38.22. *See id.*, sec. 7 ("When the issue is raised by the evidence, the trial judge shall appropriately instruct the jury, generally, on the law pertaining to such statement.").

Even assuming, without deciding, the charge failed to include an article 38.22, section 7 voluntariness instruction, because Lopez did not raise his objection before the trial court, we will reverse only upon a showing of egregious harm. *See Almanza*, 686 S.W.2d at 171; *accord Barrios*, 283 S.W.3d at 350. We, therefore, consider whether Lopez's alleged error denied him the right to a "fair and impartial trial." *See Almanza*, 686 S.W.2d at 171; *accord Barrios*, 283 S.W.3d at 350.

On appeal, Lopez contends he was unable to point to the lack of warnings, specifically the fifth warning—the right to terminate—required by article 38.22, that the officers were required to give to Lopez before questioning him. However, defense counsel cross-examined Detective Rosales and Detective Ramirez about the exact line of questioning he now claims he was unable to argue at closing. The instruction requested by defense counsel, and included within the jury charge, allowed defense counsel to argue the issue of voluntariness. After considering the entire jury charge, and the facts of this case relevant to Lopez's alleged charge error, we conclude any

error was not so egregious that Lopez did not have a fair and impartial trial. *See Gelinas v. State*, 398 S.W.3d 703, 710 (Tex. Crim. App. 2013).

Moreover, for the same reasons we conclude that Lopez's statement to Investigator Gonzalez made the admission of his statement given to Laredo police officers cumulative, we conclude he did not suffer harm from the trial court's failure to include an article 38.22, section 7, voluntariness instruction in the jury charge, regarding Lopez's statement to police officers.

Having overruled Lopez's issues related to the trial court's failure to include voluntariness instructions in the jury charge pertaining to statements given to law enforcement and CPS, we turn to his assertion that the trial court erred in failing to limit the culpable mental state of the injury to a child to "result of conduct" in the jury charge

## MENS REA: RESULT OF CONDUCT

### A. Arguments of the Parties

Lopez contends the trial court erred in failing to limit the type of conduct for injury to a child to "result of conduct." The State counters that injury to a child is both a result of conduct offense and a nature of conduct offense. Additionally, Lopez's failure to object to the jury charge before the trial court, means he must show egregious harm on appeal. By his own admission, Lopez admitted shaking the child to quiet him; Lopez intended to shake the child and cause discomfort, i.e., injury. Thus, according to the State's argument, Lopez failed to show evidence of harm.

### B. Felony Murder

Lopez was charged pursuant to the felony murder statute which provides that an individual commits the offense of felony murder when he

> commits or attempts to commit a felony, other than manslaughter, and in the course
> of and in furtherance of the commission or attempt, or in immediate flight from the

commission or attempt, he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual.

TEX. PENAL CODE ANN. § 19.02(b)(3) (West 2011). In *Lomax v. State*, the Court of Criminal Appeals explained that because the "very essence" of felony murder is that an individual "unintentional[ly] murder[s] when he causes another person's death during the commission of some type of a felony," there is no culpable mental state attached to section 19.02(c)(3). 233 S.W.3d 302, 305 (Tex. Crim. App. 2007) (citing *Threadgill v. State*, 146 S.W.3d 654, 665 (Tex. Crim. App. 2004) (felony-murder is an "unintentional" murder committed in the course of a felony)). In other words, "[t]he state must prove the elements of the underlying felony, including the culpable mental state for that felony, but no culpable mental state is required for the murder committed." *Driver v. State*, 358 S.W.3d 270, 278 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd); *accord Munoz v. State*, 533 S.W.3d 448, 453 (Tex. App.—San Antonio 2017, pet. ref'd).

## C.    Charge with which Lopez Convicted

The jury found Lopez guilty of the following:

> . . . commit[ing] or attempt[ing] to commit an act clearly dangerous to human life, to-wit: by shaking [Delfino's] body AND/OR hitting [Delfino's] head or body with his hand and/or an object AND/OR striking [Delfino's] head or body on a surface, that caused the death of [Delfino], and the defendant was then and there in the course of intentionally or knowingly committing a felony, to-wit: Injury to a Child.

"Injury to a child is a result-oriented offense requiring a mental state that relates not to the specific conduct but to the result of that conduct." *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007); *Baldwin v. State*, 264 S.W.3d 237, 242 (Tex. App.—Houston [1st Dist.] 2008, pet. ref'd). "A person acts intentionally, or with intent, with respect to . . . a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." TEX. PENAL CODE ANN. § 6.03(a) (West 2011). "A person acts knowingly, or with knowledge, with

respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result." *Id*. § 6.03(b).

"If the gravamen of an offense is the result of conduct, the jury charge on culpable mental state should be tailored to the result of conduct and likewise for nature-of-conduct offenses." *Price v. State*, 457 S.W.3d 437, 441 (Tex. Crim. App. 2015). Therefore, the State was required to prove more than Lopez engaged in the conduct that caused the injury to a child with the requisite criminal intent; the State must prove that Lopez caused the injury to the child with the requisite criminal intent. *See Cook v. State*, 884 S.W.2d 485, 490 (Tex. Crim. App. 1994); *Lee v. State*, 21 S.W.3d 532, 540 (Tex. App.—Tyler 2000, pet. ref'd). The statute, however, "does not require the State to prove that the accused intended the specific injury that resulted or that the accused had knowledge that the exact injury would result." *Kolb v. State*, 523 S.W.3d 211, 216 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd). We further note that direct evidence of the required culpable mental state is not required. *See Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002). The "jury may infer intent from any facts which tend to prove its existence, including the acts, words, and conduct of the accused, and the method of committing the crime and from the nature of wounds inflicted on the victims. A jury may also infer knowledge from such evidence." *Id*. (quoting *Manrique v. State*, 994 S.W.2d 640, 649 (Tex. Crim. App. 1999)).

## D.    *Almanza* **Harm Analysis**

If, as here, the defendant did not object to the alleged error at trial, we will reverse only if the error is "so egregious and created such harm that the defendant 'has not had a fair and impartial trial.'" *Barrios*, 283 S.W.3d at 350 (quoting *Almanza*, 686 S.W.2d at 171). Lopez concedes that he did not timely object to the jury charge as it was given and that he is held to the *Almanza* egregious-harm standard. *See Almanza*, 686 S.W.2d at 171

Lopez contends the court's charge should have limited "intentionally" and "knowingly" to the "result of the conduct" because the underlying offense is injury to a child. He further argues the trial court erred because the charge failed to include a definition of "intentionally" and "injury to a child." Lopez, therefore, asserts "the jury misapplied the mens rea to the wrong conduct and incorrectly found Lopez guilty of intentionally and knowingly engaging in the conduct [i.e., shaking the child] as opposed to intentionally or knowingly desiring the result of his conduct [i.e., injury to the child]."

Even assuming, without deciding, the charge failed to include the proper mens rea, because Lopez did not raise his objection before the trial court, we will reverse only upon a showing of egregious harm. *See Almanza*, 686 S.W.2d at 171; *accord Barrios*, 283 S.W.3d at 350. We, therefore, consider whether Lopez's alleged error denied him the right to a "fair and impartial trial." *See Almanza*, 686 S.W.2d at 171; *accord Barrios*, 283 S.W.3d at 350.

We find Judge Yeary's concurrence in *Price v. State* particularly applicable to the present case. *See Price*, 457 S.W.3d at 443–46 (Yeary, J., concurring). Price was charged as follows:

> intentionally, knowingly, or recklessly cause[d] bodily injury to [the victim], . . . by intentionally, knowingly, or recklessly impeding the normal breathing or circulation of the blood of the said [victim] by applying pressure to the throat or neck of the said [victim].

*Id*. at 444 (third alteration added). Judge Yeary opined, "To me, impeding the breath or circulation sounds a lot more like the description of a type of conduct than the description of a particular *result* of conduct. Certainly, causing bodily injury is a result-oriented offense." *Id*. He rationalized that "the result of the actor's [choking] conduct [was] that his victim's breathing or circulation [had] been impeded"; but one could also argue "the result of the [aggravated sexual assault] conduct [was] that the victim [had] been sexually assaulted." *Id*.

This case is comparable. Lopez contends the charge should have included (1) an additional instruction, "'Intentionally' a person acts intentionally, or with intent, with respect to the result of his conduct when it is his conscious objective or desire to cause the result," and (2) that Lopez intentionally and knowing desired the injury, as opposed to intentionally and knowingly engaged in the shaking and/or hitting and/or striking that caused the injury.

The jury was free to determine Lopez's intent from his actions and words. By his own admission, Lopez's actions were in reaction to the baby's crying. When shaking the baby did not work, Lopez threw Delfino against the wall and onto the bed. Lopez then grabbed the baby and shook him again. The jury could reasonably determine that Lopez knew his actions were likely to cause injury to the baby. After considering the entire jury charge, and the facts of this case relevant to Lopez's alleged charge error, we conclude any error was not so egregious that Lopez did not have a fair and impartial trial. *See Gelinas*, 398 S.W.3d at 710 (noting that the *Almanza* analysis "is a fact specific one which should be done on a case-by-case basis").

We turn to Lopez's assertion the trial court erroneously admitted autopsy photographs into evidence.

## AUTOPSY PHOTOGRAPHS

### A. Standard of Review

The admissibility of photographic evidence lies within the sound discretion of the trial court. *Williams v. State*, 301 S.W.3d 675, 690 (Tex. Crim. App. 2009); *Shuffield v. State*, 189 S.W.3d 782, 786 (Tex. Crim. App. 2006). The trial court's decision to admit or exclude evidence will not be overturned on appeal absent a showing that the trial court abused its discretion. *Young v. State*, 283 S.W.3d 854, 875 (Tex. Crim. App. 2009).

**B.     Arguments of the Parties**

Lopez contends the trial court admitted five autopsy photographs, which needlessly inflamed the jury, and contained no probative value.  The State counters that the photographs showed the external and internal injuries sustained by the victim.

**C.     Texas Rule of Evidence 403 Balancing Test for Autopsy Photographs**

Rule 403 permits the exclusion of otherwise relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence."  TEX. R. EVID. 403.  When determining the admissibility under rule 403 for autopsy photographs, we consider the following factors: "the number of exhibits offered, their gruesomeness, their detail, their size, whether they are in color or black-and-white, whether they are close-up, whether the body depicted is clothed or naked, the availability of other means of proof, and other circumstances unique to the individual case."  *Williams*, 301 S.W.3d at 690.

"Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial."  *Davis v. State*, 329 S.W.3d 798, 806 (Tex. Crim. App. 2010); *accord Martinez v. State*, 327 S.W.3d 727, 737 (Tex. Crim. App. 2010).  A showing of mere prejudice is not sufficient to exclude evidence under Rule 403, "the prejudice must be 'unfair.'"  *Martinez*, 327 S.W.3d at 737 (citing *State v. Mechler*, 153 S.W.3d 435, 440 (Tex. Crim. App. 2005)).

"Autopsy photographs are generally admissible unless they depict mutilation of the victim caused by the autopsy itself."  *Williams*, 301 S.W.3d at 690.  However, "[c]hanges rendered by the autopsy process are of minor significance if the disturbing nature of the photograph is primarily due to the injuries caused by the appellant."  *Hayes v. State*, 85 S.W.3d 809, 816 (Tex. Crim. App. 2002).

**D.     Analysis**

We note the State drastically reduced the number of photographs based on defense counsel's objections.  Here, the State offered five photographs and each photograph was limited to a specific area and used by either the treating physician or the medical examiner during the testimony.  The pictures are undeniably gruesome in their nature, they depict the severity of the injuries on the deceased body of an eleven-month-old child; but that alone does not render the probative value of the photographs outweighed by any unfair prejudice.  *See Hayes*, 85 S.W.3d at 816.  The pictures depict the condition of Delfino's body that resulted from Lopez's conduct.  *See Williams*, 301 S.W.3d at 693 (noting, that although pictures were gruesome, they portrayed no more than the gruesomeness of the injuries inflicted by the defendant).  However, the one photograph depicting Delfino's skin removed, revealing internal injuries, was used to show evidence of pooling of dark blood, or fresh trauma cause by a blunt object, and was "admissible and highly probative."  As the Court of Criminal Appeals explained, in reference to autopsy photographs of the victim's skull and brain in *Gallo v. State*, "there was no danger that the jury would attribute the removal of [certain body parts] to the defendant."  239 S.W.3d 757, 763 (Tex. Crim. App. 2007).

Considering the circumstances in which the photographs were presented to the jury, we cannot say any prejudicial effect associated with allowing the State to use a limited number of photographs for the medical experts to explain relatively complicated medical issues outweighed their probative value.  *See* TEX. R. EVID. 403.  Because it was not outside the zone of reasonable disagreement for the trial court to conclude that the danger of unfair prejudice did not substantially outweigh the probative value of the photographs, we cannot conclude the trial court abused its discretion.  *See Williams*, 301 S.W.3d at 690; *Shuffield*, 189 S.W.3d at 786.

Finally, we address Lopez's arguments regarding the alleged error by the trial court during closing arguments: (1) limitation of defense counsel's closing argument, and (2) failure to instruct the jury to disregard the State's improper jury argument.

## CLOSING ARGUMENT

### A. Standard of Review

"We review the trial court's ruling on the State's objection to a defendant's jury argument for abuse of discretion." *Vasquez v. State*, 484 S.W.3d 526, 531 (Tex. App.—Houston [1st Dist.] 2016, no pet.); *see Wilson v. State*, 473 S.W.3d 889, 902 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd).

### B. Defense Counsel's Closing Arguments

#### 1. *Arguments of the Parties*

Lopez contends the trial court erred in denying his defense counsel's attempts to advance his legal theory that, based on the facts, the jury could determine the injuries were not caused intentionally or knowingly. The State counters that because defense counsel was misstating the law, the trial court properly excluded the argument.

#### 2. *Permissible Arguments by Defense Counsel*

"A defendant has the legal right to argue any theory supported by the evidence, and all inferences from the evidence that are legal, fair, and legitimate. . . ." *Wilson*, 473 S.W.3d at 902. However, an argument that misstates the law or is contrary to the court's charge is improper. *See Loar v. State*, 627 S.W.2d 399, 401 (Tex. Crim. App. [Panel Op.] 1981) (holding defense counsel may not make statements about the State's burden of proof that are inaccurate or misleading); *see also Grant v. State*, 738 S.W.2d 309, 311 (Tex. App.—Houston [1st Dist.] 1987, pet. ref'd) ("Any argument that contains a statement of the law contrary to the court's charge is erroneous and is an improper argument.").

- 27 -

*3.     Closing Argument at Trial*

During closing argument, defense counsel was attempting to argue that Lopez's shaking the baby was simply his attempt to wake up Delfino. Lopez was "not trying to hurt [Delfino]. [Lopez] just want[ed] him to wake up." Defense counsel continued,

> If he had shaken him as hard as the doctor said, it would break, wouldn't it? His neck wasn't. Pobresito. He was a delicate boy and nobody realized. He didn't intend to cause injury. And yeah, it's reckless, and it would have caused the same injury. And based on that, if you think it's reasonably possible, find him not guilty. He's not guilty of murder. That's the only charge you have before you.

Defense counsel began to tell a personal story about when his own daughter was sick. The State's improper argument objection was sustained by the trial court. Defense counsel reurged his right to explain about the idea of recklessness. The trial court denied the request.

> "Reckless" is not part of charge. I'll tell you here, that's not an instruction given to the jury, so you are not allowed to talk about it. That's a mental state. That's not an issue in this charge.

*4.     Analysis*

As we previously discussed, Penal Code section 19.02(b)(3) does not contain an accompanying mens rea for the homicide. *See Lomax v. State*, 233 S.W.3d 302, 305 (Tex. Crim. App. 2007). Because the entire basis for felony-murder is when an individual partakes in conduct that is "clearly dangerous to human life that causes the death of an individual," and the death is committed during the course of a felony "other than manslaughter," the justification for the murder conviction is based on the unintentional murder committed during an intentional felony. *See* TEX. PENAL CODE ANN. § 19.02(b)(3). Because the Legislature specifically excluded conduct that would otherwise be classified as manslaughter, the act which is "clearly dangerous to human life that causes the death of an individual," cannot be an act that causes the death of an individual by reckless or criminally negligent conduct. *See id.*; *see also id*. § 19.04(a) (defining manslaughter as a person who "recklessly causes the death of an individual"); *Lomax*, 233 S.W.3d at 305.

Here, the trial court merely prohibited defense counsel from arguing recklessness as a possible mental state. Because the proposed argument would misstate the law and mislead jurors, we conclude the trial court did not abuse its discretion in sustaining the State's objection. *See Loar*, 627 S.W.2d at 401.

## C.      State's Closing Argument

### 1.      *Arguments of the Parties*

Lopez contends the State made improper jury arguments by asking the jury to "be the voice that this child no longer has," and such comments had a substantial and injurious effect or influence on the jury's determination of guilt and punishment. The State counters the argument was a proper summation of the evidence and plea for law enforcement.

### 2.      *Permissible Arguments by the State*

"[P]roper jury argument generally falls within one of four areas: (1) summation of the evidence, (2) reasonable deduction from the evidence, (3) answer to argument of opposing counsel, and (4) plea for law enforcement." *Freeman v. State*, 340 S.W.3d 717, 727 (Tex. Crim. App. 2011); *accord Brown v. State*, 270 S.W.3d 564, 570 (Tex. Crim. App. 2008). When jury argument falls outside the approved areas, "it will not constitute reversible error unless [it] is extreme or manifestly improper . . . or injects new facts harmful to the accused into the trial proceeding." *Temple v. State*, 342 S.W.3d 572, 602–03 (Tex. App.—Houston [14th Dist.] 2010), *aff'd*, 390 S.W.3d 341 (Tex. Crim. App. 2013); *see also Brown*, 270 S.W.3d at 570.

The State is prohibited from asking that "jurors assess the same punishment they would want to impose upon the defendant if the offense had been perpetrated against them personally." *Torres v. State*, 92 S.W.3d 911, 921 (Tex. App.—Houston [14th Dist.] 2002, pet. filed) (comparing analysis in *Brandley v. State*, 691 S.W.2d 699, 712 (Tex. Crim. App. 1985), and *Boyington v. State*, 738 S.W.2d 704, 709 (Tex. App.—Houston [1st Dist.] 1985, no pet.)). The State must reinforce

the goal of objectivity and "assess[ing] a reasoned, rational, and just punishment that . . . fits both the crime and the offender." *Torres*, 92 S.W.3d at 921.

*3.     Analysis*

During the State's closing argument, the following exchange occurred:

> In a minute, the defense is going get up here and they're going to give their closing arguments. I can guarantee you they're going to try to confuse you and they're going to try to blame everybody else except the person responsible, which is [Lopez].

> But I'm going to ask you to consider all the evidence, and you be the voice that this child no longer has. Because at the end of the day, you-all are the only ones that are going to be able to speak for this child.

In *Brandley* and *Torres*, "the prosecutor directly urged the jury to imagine and focus on the events of the criminal act as if it had actually happened to them and their families." *Ayala v. State*, 267 S.W.3d 428, 435 (Tex. App.—Houston [14th Dist.] 2008, pet. filed); *see also Brandley*, 691 S.W.2d at 712 (explaining arguments that requests jurors to "abandon their objectivity" are improper); *Torres*, 92 S.W.3d at 921. By contrast, the prosecutor in *Ayala* argued, "And I submit to you that you'll never pull into a gas station again without thinking about [the defendant], never again. I know I won't. . . . And I hope you also think of [the victims], and the justice they're entitled to." *Ayala*, 267 S.W.3d at 434. The *Ayala* Court concluded that the State's argument, made immediately before and immediately after the statement, was "part of a broader plea for law enforcement," and not a request for "the jurors to abandon their objectivity by placing themselves in the victim's shoes." *Id*. at 435.

Here, the State's argument was immediately before defense counsel spoke to the jury and presented Lopez's closing argument. The statement requested that the jury "consider all of the evidence," make reasonable deductions from the evidence, not allow defense counsel to blame everyone else, and to remember the victim. We conclude that the statement made by the prosecutor

in this case clearly falls under the *Ayala* example and was a proper plea for law enforcement. *Id*. Because we cannot conclude the State's argument requested the jurors to "abandon their objectivity," the trial court did not err in overruling Lopez's objection to the State's argument.

### CONCLUSION

Having overruled each of Lopez's issues, we affirm the trial court's judgment.

Patricia O. Alvarez, Justice

PUBLISH