**The STATE of Texas, Appellant**

v.

**Jose AGUILAR, Appellee**

**No. 04-16-00689-CR**

Court of Appeals of Texas,
San Antonio.

Delivered and Filed: August 16, 2017

602

APPELLANT ATTORNEY: Fred Trevino, Webb County Public Defender's Office, 1110 Washington St Ste 102, Laredo, TX 78040-4466.

APPELLEE ATTORNEY: David Reuthinger Jr., Isidro R. Alaniz, Webb County

District Attorney, 1110 Victoria St., Ste. 401, Laredo, TX 78040.

Sitting: Karen Angelini, Justice, Marialyn Barnard, Justice, Luz Elena D. Chapa, Justice

## OPINION

Opinion by: Marialyn Barnard, Justice

The State of Texas appeals the trial court's order granting appellee Jose Aguilar's motion to suppress certain oral statements made by Aguilar to a special investigator with Child Protective Services. On appeal, the State contends the trial court erred in granting Aguilar's motion. We affirm the trial court's order.

### BACKGROUND

The Laredo Police Department ("the LPD") took Aguilar into custody following the death of an infant, M.A.M. Detective Roque Perez interrogated Aguilar, but at that time, Aguilar did not confess to killing M.A.M. However, the lead investigator, Detective David Carmona, determined Detective Perez secured sufficient evidence to place Aguilar under arrest and charge him with M.A.M.'s murder.

After Aguilar had been in custody approximately twelve hours, and while he was awaiting formal charges, CPS Special Investigator Jose Gonzalez interviewed Aguilar. The interview took place in the same interrogation room in which Detective Perez had questioned Aguilar. It is undisputed that before questioning Aguilar, SI Gonzalez did not provide *Miranda* warnings or comply with Article 38.22 of the Texas Code of Criminal Procedure.[1] During this interview, Aguilar made several incriminating statements. Ultimately, he moved to suppress the statements made to SI Gonzalez.

---

1. Detective Perez provided Aguilar with the *Miranda* warnings before he questioned him.

The trial court held a suppression hearing. At the hearing, Aguilar contended his statements to SI Gonzalez were inadmissible because SI Gonzalez was acting as an agent of law enforcement, and therefore, was required to comply with the mandates of *Miranda* and Article 38.22. After the suppression hearing, the trial court granted Aguilar's motion to suppress, and the State perfected this appeal.

## ANALYSIS

On appeal, the State contends the trial court erred in granting Aguilar's motion to suppress the statements Aguilar made to SI Gonzalez. Specifically, the State argues: (1) there is no evidence to support the conclusion that SI Gonzalez acted as a law enforcement agent; and (2) the trial court misapplied controlling precedent in analyzing the agency relationship between SI Gonzalez and the LPD.

### *Standard of Review*

■ We review a trial court's ruling on a motion to suppress for an abuse of discretion and apply a bifurcated standard of review. *Weems v. State*, 493 S.W.3d 574, 577 (Tex. Crim. App. 2016); *see Brodnex v. State*, 485 S.W.3d 432, 436 (Tex. Crim. App. 2016). Under this standard, we afford almost total deference to the trial court's determination of historical facts, especially when it is based on assessments of witness credibility and demeanor. *Furr v. State*, 499 S.W.3d 872, 877 (Tex. Crim. App. 2016); *Brodnex*, 485 S.W.3d at 436. However, we conduct a de novo review of mixed questions of law and fact that do not hinge on credibility or demeanor, e.g., a trial court's application of the law to the facts. *Brodnex*, 485 S.W.3d at 436. Additionally, we conduct a de novo review with regard to pure questions of law. *State v. Woodard*, 341 S.W.3d 404, 410 (Tex. Crim. App. 2011).

■■ At a suppression hearing, the trial court is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony. *Weems*, 493 S.W.3d at 577; *State v. Evans*, 500 S.W.3d 528, 535 (Tex. App.—San Antonio 2016, no pet.) (quoting *State v. Gray*, 158 S.W.3d 465, 466 (Tex. Crim. App. 2005)). A trial court may "believe or disbelieve all or part of the witness's testimony—even if that testimony is uncontroverted—because the court has the opportunity to observe the witness's demeanor and appearance." *Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010) (quoting *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000)); *Evans*, 500 S.W.3d at 535.

■ If a trial court makes express findings of fact, we view the evidence in the light most favorable to its ruling and uphold those factual findings as long as they are supported by the evidence. *State v. Rodriguez*, 521 S.W.3d 1, 8 (Tex. Crim. App. 2017) (citing *Valtierra*, 310 S.W.3d at 447). When a trial court does not make express findings of fact, we view the evidence in the light most favorable to the trial court's ruling and assume it made implicit findings that support its ruling, as long as those findings are supported by the record. *Furr*, 499 S.W.3d at 877; *Brodnex*, 485 S.W.3d at 436. We will sustain the trial court's ruling if it is reasonably supported by the record and correct on any theory of law applicable to the case. *Furr*, 499 S.W.3d at 877; *Weems*, 493 S.W.3d at 577.

### *Applicable Law*

■ In *Miranda v. Arizona*, the United States Supreme Court held the State may not use any statements stemming from a custodial interrogation of a defendant unless it demonstrates the use of procedural safeguards sufficient to protect the defendant's Fifth Amendment

right against self-incrimination. 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *see* U.S. CONST. amend. V. In addition, in Texas, the State may not use any statements stemming from an interrogation unless it has complied with Article 38.22. *See Nonn v. State*, 117 S.W.3d 874, 880 (Tex. Crim. App. 2003); TEX. CODE CRIM. PROC. ANN. art. 38.22 (West Supp. 2016). Article 38.22 is a "procedural evidentiary" rule that prescribes the various requirements that must be satisfied before a statement may be admitted against a defendant at trial. *Nonn*, 117 S.W.3d at 880; *see* TEX. CODE CRIM. PROC. ANN. art. 38.22. However, unlike a *Miranda* violation, a violation of the provisions of Article 38.22 does not mean the statement was necessarily obtained as a result of any legal or constitutional violation. *Nonn*, 117 S.W.3d at 880–81.

 The procedural safeguards of *Miranda* and Article 38.22 apply only to custodial interrogations by law enforcement officers and their agents. *See Berry v. State*, 233 S.W.3d 847, 855 (Tex. Crim. App. 2007) (citing *Wilkerson v. State*, 173 S.W.3d 521 (Tex. Crim. App. 2005)). Although CPS workers are state agents, their state employment alone does not render them law enforcement agents for purpose of "defining a custodial interrogation." *Berry*, 233 S.W.3d at 855. "Different types of state employees serve different roles." *Id.* As to law enforcement agents, their job is to discover crime, investigate, arrest, and gather evidence. *Id.* CPS workers, however, have a duty to protect children in their community. *Id.* At times, both law enforcement and CPS operate on "separate, parallel paths." *Id.*

 As recognized by the Texas Family Code, their paths converge when there is an allegation that "a child has been or may be the victim of conduct that constitutes a criminal offense that poses an immediate risk of physical or sexual abuse of a child that could result in the death of or serious harm to the child[.]" TEX. FAM. CODE ANN. § 261.301(f) (West Supp. 2016). In such cases, the Family Code mandates a joint investigation by law enforcement officials and CPS or other agencies charged with child protection. *See id.* Section 261.3011 of the Family Code establishes guidelines and protocols for joint investigations, including training requirements. *Id.* § 261.3011 (West 2014) (requiring training to include interviewing techniques, evidence gathering, testifying in court for criminal investigations, and instruction on rights under Fourth Amendment). There is nothing, however, in the provisions relevant to these joint investigations that creates or even suggests a per se agency relationship between law enforcement and CPS investigators. *See generally id.* § 261.301–.316 (West 2014 & West Supp. 2016). Moreover, the Texas Court of Criminal Appeals has recognized CPS's duty to investigate and report suspected child abuse does not automatically "convert a CPS worker into a law enforcement agent[.]" *Wilkerson*, 173 S.W.3d at 528–29. In other words, the law does not presume an agency relationship based merely on a joint investigation. *Id.* at 529.

 That is not to say a CPS investigator is never acting as law enforcement for purposes of *Miranda* and the procedural requirements of Article 38.22. Rather, that determination is based on the individual facts of each case, and the person alleging an agency relationship—that a CPS investigator is acting as law enforcement—has the burden to prove it. *See Berry*, 233 S.W.3d at 855; *Wilkerson*, 173 S.W.3d at 529. If the defendant proves a particular person, including a CPS worker, is in fact working for or on behalf of law enforcement by interrogating a person in custody, the CPS worker "is bound by all

constitutional and statutory confession rules, including *Miranda* and Article 38.22." *Id.* at 529–30.

The Texas Court of Criminal Appeals has recognized it can be difficult to determine whether law enforcement and CPS investigators are on parallel paths or if those paths have converged, i.e., whether the CPS investigator is acting merely on behalf of CPS or on behalf of law enforcement. *Id.* at 530. Thus, in determining whether a CPS investigator was acting as a law enforcement agent for purposes of a custodial interrogation resulting in incriminating statements, we use the test set forth by the court in *Wilkerson.* 173 S.W.3d at 530–31. The test requires that we examine the entire record, and central to our determination "are the actions and perceptions of the parties involved: the police, the CPS caseworker ... and the defendant himself." *Id.*; *see Berry,* 233 S.W.3d at 855.

First, we look for information about the relationship between the police and CPS worker, asking whether law enforcement was attempting to use the CPS workers "as its anointed agent[.]" [2] *Wilkerson,* 173 S.W.3d at 530. Second, we look to the CPS investigator's actions and perceptions. *Id.* Did the CPS investigator believe he was acting on behalf of law enforce-

ment?[3] Finally, we consider evidence of the defendant's perception of his encounter with the CPS investigator and ask whether a reasonable person in the defendant's position would have believed the interviewer was a law enforcement agent and what gave him that impression. *Id.* According to the Texas Court of Criminal Appeals, the ultimate inquiry is:

> Was this custodial interview conducted (explicitly or implicitly) on behalf of the police for the primary purpose of gathering evidence or statements to be used in a later criminal proceedings against the interviewee? Put another way, is the interviewer acting as an "instrumentality" or "conduit" for the police or prosecution. Most simply: is the interviewer "in cahoots" with the police?

*Id.*

### Evidence

As the State points out, the evidence from the suppression hearing does not answer every question set forth in *Wilkerson.* However, we find no authority to suggest the inquiries set forth in *Wilkerson* are exhaustive or that each must be answered affirmatively before a court can find the existence of an agency relationship between a CPS investigator and law enforcement. In fact, numerous cases faced

---

2. Potential questions that might arise with regard to this first inquiry include: "Did the police know the interviewer was going to speak with the defendant? Did the police arrange the meeting? Were the police present during the interview? Did they provide the interviewer with the questions to ask? Did they give the interviewer implicit or explicit instructions to get certain information from the defendant? Was there a 'calculated practice' between the police and the interviewer that was likely to evoke an incriminating response from defendant during the interview? And finally, does the record show that the police were using the agent's interview to accomplish what they could not lawfully ac-

complish themselves?" *Wilkerson,* 173 S.W.3d at 530.

3. Questions relative to this inquiry might include: "What was the interviewer's primary reason for questioning the person? Were the questions aimed at gaining information and evidence for a criminal prosecution, or were they related to some other goal? How did the interviewer become involved in the case? Did the interviewer help 'build a case' that led to the person's arrest, or was the interviewer pursuing some other goal or performing some other duty? At whose request did the interviewer question the arrestee?" *Id.*

with this issue have merely addressed the totality of the evidence without directly answering each *Wilkerson* inquiry. *See, e.g., Elizondo v. State*, 382 S.W.3d 389, 394 (Tex. Crim. App. 2012); *Berry*, 233 S.W.3d at 856; *State v. Petersen*, 469 S.W.3d 737, 742–43 (Tex. App.—Eastland 2015). After reviewing the evidence as instructed by *Wilkerson*, and considering the applicable standard of review, we hold the trial court was within its discretion when it found SI Gonzalez acted as an agent of law enforcement when he interviewed Aguilar.

At the suppression hearing, Aguilar, who had the burden of proof, presented two witnesses, Detective Carmona and SI Gonzalez. *See Berry*, 233 S.W.3d at 855; *Wilkerson*, 173 S.W.3d at 529. Although the trial court did not make formal, written findings of fact and conclusions of law, the record shows the court stated certain findings on the record at the conclusion of the suppression hearing. On the record, the trial court found:

- the meetings between SI Gonzalez and the LPD were more than incidental;
- SI Gonzalez had unfettered access to the LPD and the investigative unit;
- SI Gonzalez was permitted to conduct himself in a way consistent with other criminal investigators at the LPD;
- SI Gonzalez's role in the investigation was distinct from other CPS investigators in the unit;
- SI Gonzalez interviewed Aguilar in the same room used by Detective Perez to interview Aguilar; and
- detectives interviewed Aguilar for a significant length of time—the record shows it was approximately twelve hours.

In addition to these findings, we hold the evidence supports additional implicit findings, which support the trial court's conclusion that SI Gonzalez was acting as an agent of law enforcement.

### 1. Relationship Between SI Gonzalez and the LPD

The trial court found there were deliberate meetings between the LPD and SI Gonzalez, and that SI Gonzalez was permitted unfettered access to the LPD. This is not surprising given SI Gonzalez's admission that he had been an officer with that same investigative unit for twenty-nine years before he began his work as a CPS investigator. Moreover, in his work as a CPS special investigator, SI Gonzalez worked on several cases with Detective Carmona specifically. According to Detective Carmona, he *only* worked with SI Gonzalez on these types of cases; he never worked with any other CPS investigators.

In addition, Detective Carmona admitted SI Gonzalez would have been permitted to "listen in" on the LPD's interrogation of Aguilar. Likewise, the LPD would have been permitted to "listen in" on the CPS interview of Aguilar. This relationship is unlike those in cases wherein courts found no agency relationship because law enforcement had no knowledge of the CPS investigator's interview, law enforcement and the CPS investigator did not speak at any time before the CPS interview, and CPS interviewed the defendant at the jail after booking—not in the same room and at a time when law enforcement was still in the process of questioning the defendant. *See, e.g., Berry*, 233 S.W.3d at 855 (holding CPS worker was not acting as law enforcement and noting CPS worker interviewed defendant at jail to discuss children's removal); *Wilkerson*, 173 S.W.3d at 531 (holding CPS investigator was not acting as law enforcement and finding no evidence indicating law enforcement knew of interview or spoke to investigator before interview); *Hailey*, 413 S.W.3d at 480

(holding CPS investigator was not acting as law enforcement and noting law enforcement detective did not speak to investigator until four days after interview).

Although Detective Carmona testified he did not agree to conduct a joint investigation—distancing himself from SI Gonzalez's investigation, SI Gonzalez's testimony was to the contrary. He stated there was in fact a joint investigation, and pursuant to the statute, a joint investigation was mandated. *See* TEX. FAM. CODE ANN. § 261.301(f). SI Gonzalez's report, which Detective Carmona read at the suppression hearing, backed up SI Gonzalez's testimony. The report stated, "Investigator Carmona agreed to conduct a joint investigation."

Additionally, the record shows the LPD called CPS, and SI Gonzalez first met with the LPD detectives at the crime scene. He met them again at the LPD station before interviewing Aguilar. At each of these meetings, Detective Carmona gave SI Gonzalez an update on the investigation, including the condition of baby's body, the extensive bruising found on the baby's body, and the living conditions in the apartment. Detective Carmona admitted he gave SI Gonzalez permission to interview Aguilar and told him Aguilar confessed. He further advised SI Gonzalez the LPD was working on an arrest warrant. *Cf. Hailey*, 413 S.W.3d at 484 (holding CPS investigator was not acting as law enforcement and noting CPS investigator did not speak with police prior to interview).

Although Detective Carmona denied requesting that SI Gonzalez ask certain questions, SI Gonzalez testified he trained with the LPD on interview techniques and evidence gathering, which informed him about the type of questions he might ask Aguilar in this kind of case. SI Gonzalez also testified the LPD and the district attorney would be free to use any admissions he might acquire from Aguilar.[4] SI Gonzalez did not personally provide his report to either the LPD or the district attorney, but he testified he placed it in a database to which he knew both had access. Furthermore, at the suppression hearing, the State conceded it did not file the motion usually required to obtain a report such as that prepared by SI Gonzalez; rather the State merely "made a call and got it."

Although the LPD and CPS were statutorily mandated to conduct a joint investigation, here, unlike cases where law enforcement was unaware of the CPS investigator's actions in the case, the LPD detectives not only knew about the interview, they updated the investigator on the status of the case, advised the investigator the defendant had confessed, and permitted the investigator to interview the defendant in the police interrogation room. *See Wilkerson*, 173 S.W.3d at 533 (holding CPS investigator was not acting as law enforcement and noting police did not know about CPS investigator's interview and did not speak to investigator before interview); *Hailey*, 413 S.W.3d at 483 (holding CPS investigator was not acting as law enforcement and noting detective did not speak to CPS investigator until four days after interview).

### 2. *SI Gonzalez's Actions and Perceptions*

SI Gonzalez testified about his position as a special investigator, noting specifically

---

**4.** Although the LPD did not attempt to use SI Gonzalez's report and Aguilar's admissions contained therein to support the arrest warrant, the State is using the admissions to "build a case" in its murder prosecution of Aguilar. Thus, this is within the *Wilkerson* analysis. *See* 173 S.W.3d at 530.

that his role requires unique qualifications, including at least five years' of law enforcement experience. He stated that as a "special investigator," his investigations involve only serious cases of child abuse and child murder, mandating joint investigations with law enforcement. SI Gonzalez specifically testified his role as a "special investigator" was distinct from the role of other "regular" CPS investigators. In fact, regarding M.A.M.'s death, SI Gonzalez and a separate "regular" CPS investigator were both assigned to the investigation. SI Gonzalez admitted the "regular" CPS investigator's responsibilities included "removal cases and all that stuff"; his role did not.

SI Gonzalez stated that as a CPS special investigator, he interviewed Aguilar pursuant to section 261.301(f)—mandating a joint investigation—and section 261.3011—setting out guidelines and training requirements for joint investigation. *See* Tex. Fam. Code Ann. §§ 261.301(f); 261.3011. SI Gonzalez stated his duties in a joint investigation include investigating, collecting evidence, and testifying in criminal proceedings. In this case, however, there was no clear evidence regarding his specific purpose in interviewing Aguilar. SI Gonzalez's stated purpose was to investigate or determine whether Aguilar committed any child abuse or neglect against M.A.M. However, the evidence shows that before SI Gonzalez interviewed Aguilar he: (1) met with the medical examiner, who told him the cause of death—blunt force trauma—and condition of the baby's body; (2) twice met with Detective Carmona; and (3) knew Aguilar had "confessed" to the killing of M.A.M. Thus, SI Gonzalez had sufficient information without conducting an interview with Aguilar from which he could have determined the existence of child abuse or neglect. This evidence belies the purpose to which he testified. Thus, the trial court could have found it

was unnecessary—given SI Gonzalez's stated purpose—for there to be an interview regarding the existence of child abuse or neglect, suggesting there was some other purpose for the interview.

SI Gonzalez also stated he needed to create a safety plan for the remaining child—M.A.M.'s sibling. According to SI Gonzalez this required him to interview Aguilar. However, he ultimately admitted he never created a safety plan, and in fact testified Aguilar was not the biological father of the remaining child. Thus, by his own admission, CPS would not place the remaining child with Aguilar's relatives nor have any reason to seek to terminate his parental rights. *See Hailey*, 413 S.W.3d at 484 (holding CPS investigator was not acting as law enforcement and noting CPS investigator needed to place remaining child and placed child in foster care based on investigation and interview). Here, there is no evidence SI Gonzalez had a substantive purpose in interviewing Aguilar as there would be no civil action against Aguilar, i.e., no termination action. *See Berry*, 233 S.W.3d at 855 (holding CPS investigator was not acting as law enforcement, noting CPS investigator's purpose was to discuss removal with defendant, obtain social history, and discuss options for placing child with paternal relatives); *Wilkerson*, 173 S.W.3d at 532 (holding CPS investigator was not acting as law enforcement, noting CPS investigator's purpose was to inform parents of emergency removal within statutory mandates); *Hailey*, 413 S.W.3d at 484 (holding CPS investigator was not acting as law enforcement, noting CPS investigator testified purpose was to obtain social history and determine best placement for child).

In addition, SI Gonzalez's "unfettered access" to the investigative unit at the LPD is different from the access of investigators in cases in which the courts found

the CPS investigator was not acting as law enforcement. For example, in *Berry* and *Hailey*, the CPS investigator interviewed the defendant at the jail after his arrest. *Berry*, 233 S.W.3d at 855; *Hailey*, 413 S.W.3d at 480. In another case, the CPS investigator was not permitted to interview the defendant at the jail when she sought to interview him outside of normal visitation hours. *Miller v. State*, No. 05-10-01086-CR, 2012 WL 3241764, at *3-5 (Tex. App.—Dallas Aug. 10, 2012, pet. ref'd) (mem. op., not designated for publication). Rather, law enforcement officials required her to return during regular visitor hours to conduct her interview. *Id.*

### 3. Defendant's Perception of Interviewer

Aguilar did not testify about his perception of the interview with SI Gonzalez. Thus, we can only evaluate the situation from the standard of a reasonable person in his position. *See Wilkerson*, 173 S.W.3d at 533. SI Gonzalez testified he identified himself as a special investigator with the Department of Family and Protective Services (DFPS) and showed Aguilar his badge. The record shows SI Gonzalez began his interview around 4:45 p.m., after Detective Perez had interrogated Aguilar for hours. Aguilar had been in custody for approximately twelve hours, since at least 5:40 a.m., and had not slept since the previous night. SI Gonzalez interviewed Aguilar just after the detective and in the same interrogation room where he remained throughout his entire interrogation. This is unlike cases wherein appellate courts found no agency relationship because the CPS investigator and law enforcement conducted their interviews at different times and locations. *See Wilkerson*, 173 S.W.3d at 532; *Hailey*, 413 S.W.3d at 480.

Although SI Gonzalez identified himself as a special investigator for DFPS, the trial court could have found, based on the other factual circumstances, that a reasonable person would have perceived SI Gonzalez as an agent of law enforcement. Aguilar was held in custody for approximately twelve hours prior to the interview with SI Gonzalez, he was interviewed for hours by the LPD detectives, SI Gonzalez showed him a badge, and the interview took place in the same room where the LPD detectives interviewed him.

### CONCLUSION

Viewing the evidence in the light most favorable to the trial court's ruling and deferring to the trial court's explicit and implicit historical findings of fact, we hold the trial court did not err in concluding SI Gonzalez conducted the interview of Aguilar—explicitly or implicitly—on behalf of law enforcement for the purpose of gathering evidence or statements to be used in a later criminal proceedings against Aguilar. *See Wilkerson*, 173 S.W.3d at 530. The trial court's ruling is supported by the record and in accordance with the applicable law as set out in *Wilkerson*. Accordingly, we hold the trial court did not abuse its discretion in granting Aguilar's motion to suppress, overrule the State's appellate issue, and affirm the trial court's order.