Filed 7/6/23  P. v. Mejia-Picazo CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>          Plaintiff and Respondent,<br><br>v.<br><br>ENRIQUE ERNESTO MEJIA-PICAZO,<br><br>          Defendant and Appellant. | A165486<br><br>(Solano County<br>Super. Ct. No. VCR232064)<br><br>ORDER MODIFYING OPINION<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on June 28, 2023, be modified as follows:

1.  On page 4, first full paragraph, third sentence, the word "Visalia" is deleted and replaced with "Vallejo," so the sentence reads as follows:

> Urroz also frequented the Vallejo Police Department as part of his CWS employment to interview arrestees.

There is no change in the judgment.

Dated:

_____
MARGULIES, ACTING P. J.

Filed 6/28/23 P. v. Mejia-Picazo CA1/1 (unmodified opinion)
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br> v. <br><br> ENRIQUE ERNESTO MEJIA-PICAZO, <br><br> Defendant and Appellant. | A165486 <br><br> (Solano County <br> Super. Ct. No. VCR232064) |

Defendant Enrique Ernesto Mejia-Picazo appeals his conviction of aggravated sexual assault of a minor, asserting the trial court improperly denied his *Massiah*[1] motion and request for a mistrial. We disagree and affirm the judgment.

## I.
## BACKGROUND

### A. *Factual Background*

Defendant was dating the minor's mother and resided in the family home for approximately one year. The minor reported that defendant began touching her at age 12. She asserted defendant first touched her while watching television, which included grabbing her breasts, touching

---

[1] *Massiah v. United States* (1964) 377 U.S. 201 (*Massiah*).

underneath her underwear, and digitally penetrating her vagina. During the course of the year, the minor estimated defendant raped her 15 to 17 times, touched her vagina "many" times, put his mouth on her breasts over 10 times, and showed the minor pornography a couple of times.

The minor stated defendant's touching made her feel afraid and uncomfortable. When the minor attempted to stop defendant, he used force, threatened her by stating he had a gun and "could do anything with it," and threatened to touch the minor's younger sisters.

The minor eventually informed her uncle about defendant's conduct. The uncle told the minor to contact him if defendant touched her again. A few days later, defendant held down the minor, put his mouth on her lips, breasts, and vagina, touched her vagina, and raped her. Afterwards, the minor had abrasions around her vagina that were painful and bled, and had pain while urinating.

The minor again informed her uncle of defendant's conduct, and her uncle took her to the hospital. At the hospital, the minor underwent an examination by a sexual assault nurse. The minor described defendant's conduct and reported pain in her vagina when sitting and urinating. The nurse found abrasions consistent with sexual intercourse and collected swabs from the minor's shoulder, breasts, underwear, mouth, vagina, and cervix.

A forensic examiner noted DNA was detected on the underwear and breast swabs. A criminalist opined there was "strong support" defendant was a contributor to the DNA mixture on the inside crotch of the minor's underwear, "very strong support" defendant was a contributor to the DNA mixture on the outside crotch and front panel of the underwear, and "strong evidence" and "very strong support" defendant was a contributor to the DNA mixture on two different breast swabs.

The police subsequently arrested defendant. Defendant denied culpability when questioned by the police.

## B. Procedural Background

The Solano County District Attorney filed an information charging defendant with aggravated sexual assault of a child by means of sexual penetration (Pen. Code,[2] § 269, subd. (a)(5); count 1), aggravated sexual assault of a child by means of rape (§ 269, subd. (a)(1); count 2), and continuous sexual abuse (§ 288.5, subd. (a); count 3). The information further alleged seven aggravating factors in connection with count 3. However, the jury only was instructed on four aggravating factors.

The jury found defendant guilty of all three counts. The jury also found true two aggravating factors in connection with count 3: vulnerability of the victim and taking advantage of a position of trust. The trial court sentenced defendant to concurrent prison terms of 15 years to life for counts 1 and 2, and a consecutive prison term of 12 years on count 3. Defendant timely appealed.

## II.

## DISCUSSION

On appeal, defendant argues his alleged confession to a social worker, Marvin Urroz, was obtained in violation of his Sixth Amendment rights under *Massiah*. He further contends the trial court erred in denying his motion for mistrial based on prosecutorial misconduct and alleged bias.

## A. Sixth Amendment

### 1. Relevant Background

Urroz, an emergency response social worker with Solano County Child Welfare Services (CWS) was assigned to the dependency investigation for the

---

[2] All statutory references are to the Penal Code unless otherwise noted.

3

minor. CWS's standard protocol for investigations is to interview the child, family members, and custodial parent(s). It also is standard protocol to interview the alleged abuser. The social worker would then prepare a service log and an investigation narrative.

The record indicates Urroz had two main points of interaction with the police. First, Urroz attended a multidisciplinary interview of the minor, which involved all relevant parties. Urroz also frequented the Visalia Police Department as part of his CWS employment to interview arrestees. During one visit, one of the detectives asked Urroz to serve as an interpreter for his interview with the minor's mother. Urroz proceeded to translate for the detective, during which Urroz asked some questions not posed by the detective, and provided the detective with insight as to the minor's mental state. Following the detective's interview, Urroz stayed and conducted his own interview with the mother.[3]

Urroz also requested permission from the police to interview defendant per CWS protocol. Urroz explained this process as follows: "We have a protocol set up when we are doing [a multidisciplinary interview], when we are doing investigations in concert with any of the police department law enforcement. So, the goal of that protocol is that once law enforcement has done whatever they need to do, then at that point I go ahead and interview the alleged abuser." Upon receiving permission, Urroz interviewed defendant in the Solano County jail. He advised defendant of the dependency proceedings, and asked if he had any comments. During this interview, defendant admitted to Urroz that he had sex with the minor, and sought to

---

[3] At the detective's request, Urroz also passed along a photograph of defendant to the police that had been provided by the minor's uncle.

justify his conduct. Urroz did not ask any follow-up questions regarding defendant's admission.

Urroz only recorded comments from defendant that were relevant to his investigation. He then prepared an investigation narrative, which included defendant's statement, and provided it to his supervisor. Urroz did not know how the police learned about defendant's statement. CWS ultimately did not file a dependency petition because the mother was deemed a "protective parent."

Defendant moved to suppress his statement to Urroz as violating his Sixth Amendment rights. He asserted Urroz was acting as an agent of law enforcement because he was kept informed by the police of the investigation, provided information to the police, participated in police interviews, obtained police permission to interview defendant, and had no substantive reason to interview defendant apart from assisting law enforcement.

During the Evidence Code section 402 hearing on defendant's motion, both police officers involved in the matter testified they were not collaborating with CWS, did not ask any CWS employee to speak with defendant, and did not discuss the details of the criminal investigation with anyone at CWS. Urroz also testified at the hearing and explained his primary duty was to protect the child. He explained it was CWS's policy to notify the accused of the allegation and the results of CWS's investigation and "ask is there anything you need to say or you want to say about it." The information provided by Urroz to defendant was to "let [defendant] know there is . . . a child abuse allegation, not a criminal investigation." Urroz stated neither the police nor the district attorney requested he interview defendant.

Following the hearing, the court denied defendant's motion. The court expressed concern about the lack of "boundaries" implemented by the Family Justice Center,[4] and noted "these agencies violate *Massiah* by having no boundaries, by having no policies to ensure the existence of boundaries and there's a pretty good record that supports that." However, as to Urroz, the court stated, "it is clear to me" that "he goes and does this all the time without many boundaries. But there's no evidence here in the record that he was directed to do so." The court noted Urroz generally "checks to make sure that in [interviewing a defendant] he won't be interfering with the criminal case. And then once they green light it," he does "his own thing."

**2. Analysis**

"The Sixth Amendment to the United States Constitution guarantees the assistance of counsel during all stages of a criminal prosecution. In *Massiah*[, *supra*,] 377 U.S. 201, the high court held that once a defendant has been charged with any crime, any 'government agent[]' who elicits incriminating statements from a defendant regarding that crime outside the presence of counsel violates this protection. [Citation.] Statements made under such conditions 'are inadmissible at a trial on the charges to which the statements pertain.' [Citation.] This prohibition on government agents applies equally to law enforcement officers and private persons enlisted by the government to elicit incriminating statements. '[T]he primary concern of the *Massiah* line of decisions is secret interrogation by investigatory techniques that are the equivalent of direct police interrogation.' [Citation.]

---

[4] The Family Justice Center appears to have been part of the district attorney's office, and employs forensic interviewers for multidisciplinary interviews.

" 'A trial court's ruling on a motion to suppress informant testimony is essentially a factual determination, entitled to deferential review on appeal.' [Citation.] To prevail, [a defendant] must show ' "that the informant (1) was acting as a government agent, i.e., under the direction of the government pursuant to a preexisting arrangement, with the expectation of some resulting benefit or advantage, and (2) deliberately elicited incriminating statements." ' [Citations.] 'Circumstances probative of an agency relationship include the government's having directed the informant to focus upon a specific person, such as a cellmate, or having instructed the informant as to the specific type of information sought by the government.' " (*People v. Johnsen* (2021) 10 Cal.5th 1116, 1152.)

Both parties contend *People v. Keo* (2019) 40 Cal.App.5th 169 (*Keo*) support their respective positions. In *Keo*, the defendant was convicted of murdering the mother of his two children. (*Id*. at p. 173.) He asserted on appeal that the trial court erred in admitting statements he made while in custody to a social worker performing an investigation in a dependency proceeding. (*Ibid*.) The court rejected his argument. In doing so, the court identified " '[t]he most important factors' " when assessing whether a social worker acts as an agent of law enforcement: " 'whether the investigator discussed the case with police prior to the interview, whether the interview was conducted at the police's request, and whether the primary purpose of the investigator's visit was to elicit a confession while in cahoots with law enforcement.' " (*Id*. at p. 184.) The court noted the social worker (1) conducted the interview for the purpose of determining the best interests of the children, not to develop evidence to assist law enforcement in the criminal case; (2) did not discuss the facts of the case with law enforcement or the prosecutor before interviewing the defendant; and (3) did not provide her

7

report to the prosecution until a year after the interview. (*Id.* at p. 187.) Accordingly, the court found the social worker "was not acting ' "under the direction of the government pursuant to a preexisting arrangement, with the expectation of some resulting benefit or advantage." ' " (*Id.* at p. 186.)

Defendant argues Urroz constitutes an agent of law enforcement under *Keo* because he (1) was regularly at the police department, including interviewing people in the jail and interacting with police officers; (2) assisted a detective in interviewing the minor's mother, including asking his own questions and providing commentary of certain elicited facts; (3) conducted his own interview of mother at the police department; (4) participated in the multidisciplinary interview; (5) obtained a picture of defendant at the police's request to assist with identification; and (6) sought permission from the police prior to interviewing defendant.

While Urroz certainly had repeat contacts with police, we disagree that the record supports a finding that Urroz acted as a government agent. Notably, none of the evidence cited by defendant demonstrates Urroz was acting " ' "under the direction of the government pursuant to a preexisting arrangement." ' " (See *People v. Johnsen*, *supra*, 10 Cal.5th at p. 1152.)

As in *Keo*, Urroz's function was to conduct a child welfare investigation, not support the criminal prosecution. While the court noted Urroz's interview with defendant did not have a meaningful impact on the child welfare investigation because the mother was deemed a protective parent and defendant did not have custody rights, Urroz stated he spoke with defendant because it was standard CWS protocol to inform the alleged abuser of the charges and allow them to provide any response. Regardless of the merits of this protocol, it indicates Urroz did not interview defendant at the direction of the police. Similarly, Urroz, like the social worker in *Keo*, did not

discuss the criminal investigation with police prior to meeting with defendant. While defendant speculates that Urroz discussed the case with a detective, nothing in the record supports that suggestion. Finally, Urroz, like the social worker in *Keo*, did not share his report containing defendant's statement with the police or prosecution. Rather, he only gave his investigation narrative to his supervisor. Accordingly, the record does not support defendant's claim that Urroz was acting as an agent for law enforcement.

Defendant also claims two out-of-state cases, *Com. v. Howard* (Mass. 2006) 845 N.E.2d 368 and *State v. Aguilar* (Tex. Ct.App. 2017) 535 S.W.3d 600, further support his position. We find those cases distinguishable. In *Howard*, the social worker identified her role "as part of a joint investigation with the district attorney's office." (*Howard*, at p. 371.) The social worker unilaterally reported information about the defendant to the investigating police officer, questioned the defendant repeatedly and specifically about his guilt, and forwarded her report to the district attorney's office. (*Ibid.*) Similarly, in *Aguilar*, the child protective services investigator discussed the case with police, testified it was a "joint investigation," and placed his report in a database to which the prosecutor and police had access. (*Aguilar*, at pp. 607–608.) Here, however, the record does not indicate a similar level of collaboration between Urroz and the police. As noted above, the record does not reflect a joint investigation, any ongoing discussions about the status of the criminal case, or submission of the resulting report to police. Without

such evidence, the trial court properly denied defendant's claim of a *Massiah* violation.[5]

## B. *Motion for Mistrial*

Defendant next argues the trial court abused its discretion in denying his motion for mistrial based on alleged racial bias injected by the prosecutor. We disagree.

### 1. Relevant Background

During the prosecution's examination of Detective Greenberg, the prosecutor asked him whether he engaged in small talk, in English, with defendant during the booking process. Greenberg responded affirmatively, and opined defendant understood English because they were able to communicate. In clarifying that defendant spoke English, the prosecutor elicited testimony that defendant had been in the United States over 10 years. Defense counsel objected.

Defense counsel then also asked Greenberg about defendant's English skills, clarifying, "He could have conversational English?" After Greenberg responded, "Yes," defense counsel observed a criminal defendant is entitled to an interpreter in California if he is not a native English speaker.

The court paused questioning and interjected the following commentary to the jury: "Any time I hear someone ask a question like when did somebody get here, there's—these crazy politics in our nation right now and you will hear a lot of nativist code language which is a form of bias, so for purposes of our analysis today, it doesn't matter when [defendant] got here. Doesn't matter the color of his skin, doesn't matter the language which he

---

[5] We need not address defendant's argument regarding prejudice because we conclude the court did not err in admitting Urroz's testimony regarding defendant's statement.

10

speaks.  If you feel yourself kind of responding to this nativist code, don't because it's not appropriate."  The court then further explained:  "[T]here are times when someone may be fluent to the extent they can order a beer, but not fluent to have a more lengthy and detailed conversation.  So, to the extent that—I didn't hear any express question seeking to cause you to conclude this, but he has an interpreter because we give him an interpreter and because it's appropriate that we give him an interpreter. [¶] So, to the extent someone may want to think or argue about something here being inappropriate or faked or anything like that, don't think that either.  That would not be appropriate.  There's no evidence to even suggest that."

Defense counsel then asked the detective about defendant's accent, and subsequently requested a mistrial.  He asserted the prosecutor had no purpose in raising the issue of defendant's English-speaking abilities apart from suggesting defendant was "faking" and "is somehow disingenuous." Defense counsel argued, "It's misconduct.  It's inflammatory.  It's possibly a violation of [the] California Racial Justice Act. . . . It is a violation of jury instructions which ask people not to consider the country of origin."  In response, the prosecution argued his questions were relevant because the police report indicated defendant was being disingenuous about understanding the charges based on his language skills.

Following arguments by counsel, the court denied the motion for mistrial.  In doing so, however, the court expressed concern regarding the prosecutor's apparent lack of awareness of the racial bias elements.

The trial court then admonished the jury:  "[Y]ou heard this question of interpreters and questioning him and all of that.  And I should have shut that down right away.  Because we do not—there's certain limited exceptions to this, but it was inappropriate of me to allow the officer to express an

11

opinion, or observation, about anybody else's language capacity or ability to understand. So there's two issues there. One of them is that that's generally the sort of thing that requires a much deeper discussion and any of you have ever had kids who have speech issues like I did, you would know what I'm talking about. . . . [¶] And so, we generally do not and I should not have allowed in these circumstances someone to come in and start opining about someone's ability to understand a different language. . . . [¶] The second issue is this kind of thing can very quickly become, the word I used to use as a lawyer is 'code.' Code for something else. When we're talking about people of other colors, of other languages, we spent most of the time in voir dire looking to make sure everyone knew we were going to work hard to not speak in code. So not be receptive to that kind of code. So not be biased against people, among other things because of their language." The court instructed the jury "to disregard everything that was just stated and responses to either attorney's questions about the officer's opinion or experience about his language engagement with [defendant]. . . . So disregard it as if you never heard it."

### 2. *Analysis*

" 'The applicable federal and state standards regarding prosecutorial misconduct are well established. " 'A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." ' " [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves " ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " [Citation.]' [Citation.] '[W]hen the claim focuses upon comments made by

12

the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' " (*People v. Smithey* (1999) 20 Cal.4th 936, 960; see also *People v. Prieto* (2003) 30 Cal.4th 226, 260.)  The focus of the inquiry is on the effect of the prosecutor's conduct on the defense, not on the intent or bad faith of the prosecutor.  (*People v. Crew* (2003) 31 Cal.4th 822, 839.)

"Whether misconduct warrants a mistrial is a decision which is within the sound discretion of the trial court." (*People v. Bennett* (2009) 45 Cal.4th 577, 595.)  "A trial court should grant a motion for mistrial 'only when " 'a party's chances of receiving a fair trial have been irreparably damaged' " ' [citation], that is, if it is 'apprised of prejudice that it judges incurable by admonition or instruction.' " (*People v. Avila* (2006) 38 Cal.4th 491, 573.)

We conclude the trial court did not abuse its discretion in denying defendant's motion for mistrial.  Assuming the prosecutor's statements regarding defendant's ability to speak and understand English constituted misconduct, any harm was remedied by the trial court's admonishment to the jury.  The court gave a prompt and thorough admonition, identifying for the jury the exact material at issue, explaining why it was improper, and instructing them to disregard all testimony on the issue.  "[A] prompt admonition by the court . . . is generally deemed to remedy the problem arising from improper argument by the prosecutor." (*People v. Smith* (2009) 179 Cal.App.4th 986, 1007.)  Nothing in the record indicates the jury improperly relied on the statements at issue or otherwise failed to follow the admonition.  (See *People v. Bennett*, *supra*, 45 Cal.4th at p. 595 ["When a trial court sustains defense objections and admonishes the jury to disregard the comments, we assume the jury followed the admonition and that prejudice

13

was therefore avoided."].)  Accordingly, nothing in the record suggests defendant's right to a fair trial was " ' " 'irreparably damaged.' " ' "  (See *People v. Avila*, *supra*, 38 Cal.4th at p. 573.)

The case upon which defendant primarily relies, *Pena-Rodriguez v. Colorado* (2017) 580 U.S. 206, is distinguishable.  In that case, a juror expressed anti-Hispanic bias against the defendant and a witness during jury deliberations.  (*Id.* at pp. 212–213.)  The court recognized the general rule that a juror's statements during deliberations cannot be used to undermine a verdict.  (*Id.* at pp. 217–218.)  In that instance, however, the court found "where a juror makes a clear statement that indicates he or she relied on racial stereotypes or animus to convict a criminal defendant, the Sixth Amendment requires that the no-impeachment rule give way in order to permit the trial court to consider the evidence of the juror's statement and any resulting denial of the jury trial guarantee."  (*Id.* at p. 225.)

Here, the jury did not make any statements indicating it relied on racial stereotypes or animus to convict defendant.  Rather, both counsel asked a series of questions regarding defendant's comprehension of English.  The court subsequently struck that testimony and admonished the jury to disregard that evidence in its entirety.  It also specifically warned the jury against employing bias or stereotypes in evaluating the matter.  We have no basis to conclude the jury did not follow this instruction, and defendant thus has failed to demonstrate any resulting prejudice.[6]

---

[6] None of the other cases defendant relies upon support his assertion that alleged racial bias cannot be cured by admonition or instruction.  (See, e.g., *People v. Haskett* (1982) 30 Cal.3d 841, 854 [blood-stained newspaper displayed to jury]; *Krulewitch v. United States* (1949) 336 U.S. 440, 441–442 [hearsay statements regarding conspiracy]; *People v. Antick* (1975) 15 Cal.3d 79, 98 [prior conviction evidence].)

### 3. California Racial Justice Act

Defendant also asserts the prosecutor's questioning violated the California Racial Justice Act of 2020 (§ 745; CRJA). Under the CRJA, "[t]he state shall not seek or obtain a criminal conviction or seek, obtain, or impose a sentence on the basis of race, ethnicity, or national origin." (§ 745, subd. (a).) The CRJA then sets forth various categories of conduct "which, if proved, is enough to 'establish' a violation of section 745, subdivision (a)." (*Young v. Superior Court* (2022) 79 Cal.App.5th 138, 147.) As relevant here, these potential violations include (1) when "[t]he judge, an attorney in the case, a law enforcement officer involved in the case, an expert witness, or juror exhibited bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin" (§ 745, subd. (a)(1)); and (2) if "[d]uring the defendant's trial, in court and during the proceedings, the judge, an attorney in the case, a law enforcement officer involved in the case, an expert witness, or juror, used racially discriminatory language about the defendant's race, ethnicity, or national origin, or otherwise exhibited bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin" (*id.*, subd. (a)(2)).

In the event of an alleged violation of the CRJA, subdivision (b) authorizes the defendant to file a motion or a petition for writ of habeas corpus. (§ 745, subd. (b).) Subdivision (c) then provides, "If a motion is filed in the trial court and the defendant makes a prima facie showing of a violation of subdivision (a), the trial court shall hold a hearing. A motion made at trial shall be made as soon as practicable upon the defendant learning of the alleged violation. A motion that is not timely may be deemed waived, in the discretion of the court." (§ 745, subd. (c).) "The defendant

shall have the burden of proving a violation of subdivision (a) by a preponderance of the evidence." (§ 745, subd. (c)(2).)

In response, the Attorney General asserts defendant's CRJA claim has been forfeited because he failed to raise the issue before the trial court. We agree. Subdivision (c) required defendant to make a motion and prove the violation by a preponderance of the evidence. (§ 745, subd. (c), (c)(2).) The record does not indicate defendant made either a written or oral motion under the CRJA. While the parties argued about the validity of the questions, defense counsel mentioned in passing that it "possibly" violated the CRJA, and the court found such questions to be problematic, we decline to conclude the objection satisfies the procedural requirements of the CRJA. Accordingly, defendant's argument under the CRJA has been forfeited.[7]

## III.

## DISPOSITION

The judgment is affirmed.

---

[7] Because we conclude the trial court did not err in admitting defendant's statements or denying his motion for mistrial, we need not address his cumulative error argument.

MARGULIES, J.

WE CONCUR:

HUMES, P. J.

BANKE, J.

A165486
*People v. Mejia-Picazo*

17